[Crim. No. 150.    Third Appellate District.—May 2, 1911.]

## THE PEOPLE, Respondent, v. CHARLES A. BOYD, Appellant.

CRIMINAL LAW—ROBBERY—CONCEALED WITNESS TO CONFESSION—SHOWING OF DILIGENCE—ADMISSION OF DEPOSITION.—Upon a prosecution for robbery, it was proper to admit in evidence the deposition of an absent witness who testified at the preliminary examination to the defendant's confession of the robbery, where due diligence was shown to serve him with subpoena, and after inquiry at his family home, every clue given by his wife as to his whereabouts was followed without avail, and search was made for him throughout that county and the adjoining county, and it became evident that he was concealing himself to avoid the service of a subpoena upon him.

ID.—SUBPOENA TO EVERY COUNTY NOT REQUIRED — "DUE DILIGENCE" RELATIVE TO CIRCUMSTANCES.—"Due diligence" does not require in such case that a subpoena should be issued to every county in the state. "Diligence" is a relative term; and what would amount to "due diligence" under one state of facts would fall short of it under another and different state of facts, and it depends essentially upon the particular circumstances of each case.

ID.—DILIGENCE A QUESTION FOR TRIAL COURT.—The question whether the circumstances as they appear to the trial court show that "due diligence" has been used in a particular instance, is for its determination, and the appellate court will hesitate to disturb a ruling upon this ground, when it has any substance whatever upon which to rest.

ID.—PROPER DISCRETION OF TRIAL COURT PRESUMED.—The presumption is that the discretion of the trial court has been properly exercised in determining the question of diligence, and that presumption must

be overcome by a clear want of facts before its order will be disturbed.

ID.—DEPOSITION NOT PREJUDICIAL — CUMULATIVE EVIDENCE OF CONFESSION.—Regardless of the sufficiency of the showing of diligence, it is clear that the admission of the deposition is not prejudicial, as it only shows cumulative evidence of the confession of the defendant, which was fully established by other witnesses, including the evidence of officials, which was sufficient to sustain the verdict.

ID.—MISCONDUCT OF JUROR—INEBRIETY OUT OF COURT—PROOF OF SOBERNESS IN COURT — CONFLICTING EVIDENCE — RULING CONCLUSIVE.— Where there was a charge of misconduct of a juror in being intoxicated out of court, and in so far as such evidence might tend to show that he was under the influence of liquor in court, it was met by counter-affidavits that he did not appear to be under the influence of liquor at any time during the trial, or during the discussion of the case in the jury-room; and there was no showing that either of the attorneys or the trial judge observed anything peculiar in his manner in court, the ruling of the court against any misconduct affecting the case in court is conclusive.

ID.—DISCUSSION OF CASE BY JUROR—CONFLICT—PROVINCE OF COURT.— Where the evidence was conflicting whether a juror discussed the merits of the case during the trial, it was for the trial court to determine the truth of the matter.

ID.—SUPPORT OF VERDICT.—Where there is sufficient evidence in the record to support the verdict, it cannot be set aside on the ground that there may appear in the record some testimony favorable to the defendant.

ID.—PRESUMPTIVE CONSIDERATION BY JURY.—The jury presumptively gave due attention and consideration to all the important facts brought out by the evidence, those favorable to as well as those condemnatory of the defendant.

APPEAL from a judgment of the Superior Court of Siskiyou County, and from an order denying a new trial. James F. Lodge, Judge.

The facts are stated in the opinion of the court.

Gillis & Gillis, for Appellant.

U. S. Webb, Attorney General, and J. Charles Jones, for Respondent.

HART, J.—The defendant, having been informed against by the district attorney of Siskiyou county for the crime of

robbery, was tried therefor, convicted of said crime and thereupon sentenced by the court to imprisonment in the state prison for the term of two and a half years.

This appeal is from the judgment and the order denying his motion for a new trial.

The points made by the appellant for a reversal are: 1. Errors in the decision of questions of law arising during the course of the trial; 2. That the jury were "guilty of misconduct by which a fair and due consideration of the case has been prevented"; 3. "That the verdict is contrary to the law and the evidence in the case."

1. The claim that the court erred in the decision of questions of law grows out of the admission in evidence, over the objection of the defendant, of the deposition of one George L. Weston, who was a witness at the preliminary examination and who could not be found by the sheriff and his presence at the trial secured. The ground of the objection to said deposition was that a sufficient showing of diligence in an effort to subpoena and procure the attendance of said witness at the trial had not been made to justify the ruling of the court in permitting it to be read to the jury.

By section 686, subdivision 3, of the Penal Code, it is provided that, where the charge has been preliminarily examined before a committing magistrate, and the testimony taken down by question and answer, in the presence of the defendant, who has, either in person or by counsel, cross-examined or had an opportunity to cross-examine the witness, the deposition of such witness may be read, upon its being satisfactorily shown to the court that he . . . cannot with due diligence be found within the state.

Upon the question of diligence it was shown that the case was set for trial for the thirty-first day of October, 1910; that, on the twenty-seventh day of September, 1910, a subpoena for Weston was issued by the district attorney and delivered into the hands of the sheriff for service; that the sheriff went to the home of the witness at the town of Etna Mills, in Siskiyou county, and that that officer was informed by the wife of the witness that the latter was not at home and that she did not know exactly where he was; that she declared that, suffering from rheumatism, the witness left home some days before, saying that he intended going to

Neyes Springs, in said county, and that if, upon arriving at said springs, he found them closed for the season, his intention was to go to Tuscan Springs, in Tehama county. It was shown that the sheriff addressed letters to all his deputies, located in various parts of Siskiyou county, commanding them to search for Weston; that a deputy sheriff went to Neyes Springs and failed to find him there; that the district attorney personally telephoned to Tuscan Springs, giving the name and description of the witness and inquiring whether he was there or had been there, "and the management at Tuscan Springs informed me there was no man by that name there." The district attorney further testified: "I telephoned up to Garretson Springs, a mineral spring up on the mountain here, thinking probably if he was going to a mineral spring, he might go there, and was informed that there was no man by that name there."

Besides the foregoing, it appears from the record that the officers entertained some suspicion that Weston might be connected either with the robbery of which the defendant was accused or with some other crimes that had been perpetrated in and about the town of Etna Mills. It is evident, from this fact, that the witness was purposely avoiding the service of process, thus hoping to escape the ordeal of such a cross-examination as that to which he was subjected at the preliminary hearing.

We cannot say, upon the showing made, that the court abused its discretion in allowing the deposition of Weston to be read.

Counsel for appellant seem to think that, in order to disclose the "due diligence" contemplated by the statute and necessary to be shown before the deposition of an absent witness taken at the preliminary hearing may be read in evidence at the trial, it must appear that a subpoena for such witness has been sent to every county in the state. In this they are mistaken.

As is said in *Heintz* v. *Cooper*, 104 Cal. 670, [38 Pac. 512], "diligence is a relative term incapable of exact definition. What would amount to due diligence under one state of facts would fall absolutely short of it under another and different state of facts. It depends, therefore, so essentially upon the particular circumstances of each case, with all their distinct

and varying phases and bearings, as they have appeared to the lower court at the trial and throughout the conduct of the cause, in determining whether diligence has been used in any particular instance, that this court should hesitate to disturb a ruling upon this ground where it has any substance whatever upon which to rest. The presumption is that the discretion has been properly exercised, and that presumption must be overcome by a clear want of facts before the order will be disturbed." (See *Jones* v. *Singleton,* 45 Cal. 92; *Baker* v. *Joseph,* 16 Cal. 180; *Kenezleber* v. *Wahl,* 92 Cal. 202, 28 Pac. 225; *People* v. *Johnson,* 13 Cal. App. 779, 110 Pac. 965.)

In the case at bar, we have seen that the witness was a resident of Siskiyou county, was a married man and that his wife, at the time the sheriff sought to serve a subpoena upon him, was at their home at Etna Mills; that she pretended to know nothing of his precise whereabouts at the time the sheriff called at their home in search of him. These circumstances were such as to make it manifest to the mind of any reasonable person that he had not permanently abandoned Siskiyou county and such as to indicate that the witness was trying to avoid service of the subpoena and to that end was in hiding. The officers, in their efforts to find him, searched and inquired for him at all the places where, according to information obtained from all the available sources, there was any likelihood that he might be found. If the witness was purposely keeping out of the way of the officers so that he might not be subpoenaed, as the circumstances very strongly tend to show was the fact, it would then have been perfectly futile to have sent subpoenas to other counties, for, if his purpose was to elude the officers, he would have been very particular to conceal his identity, so far as he could, wherever he might be or go.

If the witness had been at the time without a family in Siskiyou county or some other strong incentive for his return to that county, and it was not made to appear, as it certainly was made to appear, that he was endeavoring to avoid the service of process calling for his appearance as a witness at the trial, we cannot say but that, perhaps, a better showing than was made here might be required. Under all the circumstances disclosed here, however, we think that the court made no error in its ruling admitting the deposition.

But, conceding that the showing of diligence does not quite measure up to the requirements of the statute, we are of the opinion that the ruling was without prejudice, since the testimony thus brought to the attention of the jury involved, in substantial effect, only a repetition of the testimony given by the witnesses, Lowe, Moxley and Sovy. Weston testified at the preliminary hearing to an alleged confession by the defendant made to the witness a short time subsequently to the commission of the robbery. Said confession was the only subject concerning which Weston testified. Lowe testified, at the trial, that the defendant likewise confessed to him that he was the author of the crime. Moxley and Sovy testified that they overheard a conversation between the defendant and Weston in which the accused confessed to having committed the crime. The deposition of Weston was, therefore, as stated, only corroboratory and, in fact, cumulative, of other testimony disclosing, substantially, the identical facts to which the deposition related, and, as before suggested, we cannot perceive how it could, under such circumstances, have prejudiced the defendant. In view of the cross-examination of Weston, at the hearing before the magistrate, which cast no little suspicion about him in connection with certain transactions of a dubious character, his deposition could have added little force to the testimony of the confessions as given by the other witnesses. The testimony of Lowe, Moxley and Sovy (the last two constable and city marshal, respectively) is sufficient, without the deposition of Weston, to sustain the verdict.

2. It is, secondly, contended that the alleged misconduct of the jury consisted in the inebriety, during the progress of the trial, of juror Fowler. In support of said charge, the defendant filed a number of affidavits in which the affiants declared that, during the recesses of the court while the trial was in progress, said juror so freely used intoxicating liquor that, on several different occasions, he was in an intoxicated condition. One of the affidavits charged that, on a certain day, while the trial was going on, but during an adjournment of the court, said juror was so much under the influence of liquor that "he talked at random and acted like an insane or wild man," etc.

A counter-showing upon this issue was made by the people in the form of affidavits made by the other jurors. In each

of these affidavits it is declared that Fowler did not appear to be under the influence of liquor at any time during the trial, when the jury were actively engaged in the discharge of their duties; that, to the contrary, he at all times, when so engaged, bore every appearance of sobriety and that, after the jury retired to deliberate upon the case, he discussed the testimony and various phases of the record in an intelligent manner.

There is absolutely no evidence showing that the juror was not sober while he was actually engaged in performing his duties as a juror. No evidence was introduced that the trial judge or the attorneys observed anything unusual in the conduct of the juror while he was in the jury-box, or that he was in a condition of inebriety.

In brief, assuming that the affidavits filed by the defendant tended to prove, by reason of the quantity of liquor the juror was then shown to have consumed during the adjournments of the court while the trial was in progress, that he was or must have been still under its influence while in the jury-box, there is presented upon the issue thus made a conflict in the evidence, and, therefore, upon that proposition the ruling of the trial court cannot be overturned by this court. (See *People* v. *Emmons,* 7 Cal. App. 698, [95 Pac. 1032], and cases therein cited.)

An attempt was also made to show, by affidavits, that the same juror discussed the merits of the case with certain parties before the cause was submitted. These affidavits were flatly contradicted by the juror, and, of course, it was for the trial court to determine the truth of the matter between the conflicting testimony thus advanced upon the point.

3. It is lastly contended that the evidence does not support the verdict. This contention is not maintainable.

The facts, briefly, are: That on the night of the second day of May, 1910, a masked man appeared at the Blake Hotel, in said town of Etna Mills, a few minutes before the hour of 12 o'clock, and, leveling a pistol on the night clerk, who was alone in the bar-room at the time, forced the latter to deliver over all the cash then behind the bar. The clerk had just closed and locked the doors leading from the street and a hallway into the hotel preparatory to closing the establishment for the night, when someone attempted to enter the bar-room

by way of the door leading from said hallway into the bar-room. Thinking that the party at the door was a transient lodger who had but a few minutes previously been in conversation with him in the bar-room, the clerk spoke, saying, "Hold on, I will open the door," and thereupon unbolted the door and opened it, only to be confronted by a man whose face was concealed by a mask and who leveled a pistol on the clerk. The latter yelled for Mr. Blake, the landlord, whose room was located on the first floor and across the hall from the bar-room. Blake immediately put in an appearance in the bar-room, but, observing the weapon in the masked man's hand, leveled at the clerk, hastily made his exit from the bar-room. As stated, the clerk, at the command of the highwayman, delivered the latter all the money then behind the bar. This consisted of about $28, in various denominations, and was contained in a dice-box, which, with the money, the robber carried away, he having left the bar-room by way of one of the doors leading to the street and turned, as he reached the sidewalk, in the direction of a house of ill-fame.

Some time after the robbery, the defendant, as seen, admitted to the witnesses, Weston and Lowe, that he was the author of the crime. Weston, it appears, reported this information to constable Moxley and city marshal Sovy. Thereupon, it was arranged between Weston and the officers that the latter, at a certain hour of the night of the day on which Weston communicated to them the fact of the defendant's confession, should secrete themselves behind a high board fence in the rear of another hotel in Etna, and that, upon some pretext, Weston should induce the defendant to accompany him to a point directly opposite the spot at which the officers were to station themselves. This scheme was carried out. Weston and the defendant stood against the fence on one side thereof and the officers were against the fence directly opposite. Weston started the conversation by telling the defendant that the people were suspicious that he (defendant) had committed the Blake Hotel robbery and advising him to leave Etna. It is unnecessary to detail this conversation, it being sufficient to say that he therein admitted, according to the testimony of Moxley and Sovy, that he committed the robbery.

The clerk of the hotel testified that he could not identify his assailant, but expressed the opinion that the man who robbed him corresponded, in size and build, with the defendant.

The witness, Single, testified that, at about fifteen minutes before 12 o'clock, midnight, on the night of the robbery, the defendant came into a house of ill-fame, situated about five hundred yards from the Blake Hotel. Single further testified that he gave a bunch of keys to the defendant and requested him to deliver them to the witness Lowe, who was a bar-keeper in the saloon in the Barrenden Hotel.

Lowe testified that, shortly after he had retired, the defendant came to his room and delivered to him said bunch of keys and then asked whether he could secure a room in the hotel, and, replying to this question, Lowe told him to take "Room 17."

The testimony given by Weston, Moxley, Sovy and Lowe, all relating to the confessions of the accused, constituted the principal evidence brought out by the people directly connecting the defendant with the commission of the crime.

The defendant undertook to sustain an *alibi,* and in support of this contention testified that he went to the room of a Mrs. Willard in the Barrenden Hotel, in Etna, at about the hour of 10 o'clock on the night of the robbery and remained in said room with Mrs. Willard continuously until the hour of 2 o'clock the next morning.

Mrs. Willard corroborated the defendant, declaring that, from 10 o'clock on the night of the robbery until 2 o'clock the next morning, the defendant was not for a moment out of her room.

Relative to the alleged confessions, the defendant admitted having made them, but explained that, after the robbery, the officers had received information that certain parties had planned the robbery of the local bank, and that he was employed by the marshal to do detective work, not only in connection with the alleged contemplated robbery of the bank, but also to work on the Blake Hotel robbery. Defendant's employment as a detective was to be kept a secret or from the public, so that he could the more effectively execute his duties as such. He testified that his statements to Weston implicating himself in the hotel robbery were untrue, but that they

were prompted entirely by the hope that thus he might be able to obtain information which would lead to the discovery and apprehension of the perpetrator of that crime. He denied having admitted his guilt to Lowe, saying that the conversation with the latter about the robbery occurred in the saloon where Lowe worked and could have been heard by a number of other persons then in said saloon.

Sovy corroborated the defendant as to the hiring of the latter by him to do detective work, both in connection with the hotel robbery and the alleged proposed bank robbery.

It is insisted by counsel for the appellant that the testimony produced on behalf of their client clearly shows that the defendant's alleged confessions, by which, principally, his conviction was accomplished, were only made for the purpose of carrying out defendant's plan for apprehending the real perpetrator of the crime committed at the Blake Hotel.

The evidence, it must be admitted, presents a strange and unusual situation, for it is difficult to account for the fact, developed in this case, upon the hypothesis that the defendant is possessed of ordinary common sense, that he would voluntarily, when not under arrest, or even under suspicion then, and when, therefore, there was no apparent reason for him to do so, confess that he had committed the crime of robbery—a fact which, under some circumstances, might be satisfactorily accounted for upon the theory upon which explanation was, without success, attempted by defendant before the jury. But we think there were developed, in connection with the confessions, some circumstances which place the jury's determination of the value of said confessions as evidence of defendant's guilt beyond the power of this court to disturb it.

In the first place, it may be mentioned as a fact worthy of note that the defendant, although claiming, after his arrest and while incarcerated in the local jail, to have obtained, while acting as a detective for the city marshal, considerable information concerning other thefts and crimes occurring in and about Etna, never conveyed such information to his superior officer until after his arrest. Nor did he say anything to the officers before his arrest about his interview with Weston which was overheard by said officers. Secondly, it is to be noted that, when the interview between defendant and Weston that was overheard by the officers was in progress,

several men stepped from the rear of the hotel near which said interview was taking place, and passed by and near and back of the point at which Weston and the defendant were standing, whereupon the latter remarked, after looking over the fence to see if he could identify the men or determine where they were going, "we had better get out of here, someone will hear us." This circumstance could well have been regarded by the jury as possessing some incriminatory force or as impeaching the explanation by defendant that his confession to Weston was feigned for the purpose stated by him.

It is further argued that, accepting the night clerk's statement as to the hour at which the robbery occurred and the statement of the witness Single, as to the hour at which the defendant made his appearance in the house of ill-fame on the night of the robbery as precisely accurate, it would be impossible for the defendant to have committed the crime. The hotel clerk testified that the hotel clock always ran ahead of time from five to ten minutes, and, according to his statement, the robbery occurred at about five minutes to 12 by said clock, which, assuming it to have been running fast or ahead of the actual time from five to ten minutes, would make the precise time of the robbery from ten to fifteen minutes to 12 o'clock. Single said that the defendant came into the bawdy-house at about fifteen minutes to 12 o'clock. The defendant testified that he did not go to said house until after 2 o'clock the next morning. Said house was situated, as seen, about five hundred yards from the Blake Hotel.

All the testimony for the prosecution regarding the times at which the various events referred to occurred no doubt involved, to a great extent, mere conjectures, or, at least, only approximations. The trial occurred several months after the robbery, and the jury could well have concluded that the witnesses were not precisely accurate upon these points. But, if the jury believed the evidence of the confessions and further believed that, by those confessions, the defendant told the truth, then they were obviously thus satisfied of his guilt beyond a reasonable doubt, notwithstanding that, taken at its face value, the testimony with respect to the times of the happening of the several events, as affecting the defendant, on the night of the robbery might have a strong tendency to confirm the *alibi* for which the accused contended at the trial.

At any rate, there is sufficient evidence to support the verdict, and we cannot, therefore, set it aside on the ground that there may appear in the record some testimony favorable to defendant. The jury, presumably—indeed, presumptively—gave due attention and consideration to all the important facts brought out by the evidence, those favorable to as well as those condemnatory of the defendant, and their verdict must be interpreted to mean that their conclusion was that either the hotel clerk or Single, or perhaps both, were mistaken as to the hours of the night that the events to which those witnesses, respectively, testified occurred.

The judgment and order are affirmed.

Chipman, P. J., and Burnett, J., concurred.